# NO. 23-1182

In The
# United States Court Of Appeals For The Fourth Circuit

## JANE DOE,

*Plaintiff - Appellant,*

v.

## CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; BRADLEY LEAK, individually, as an agent of Charlotte-Mecklenburg Schools, and as a law enforcement officer of Charlotte-Mecklenburg Police Department; ANTHONY PERKINS, individually and in his official capacity as an employee of Charlotte-Mecklenburg Schools; CITY OF CHARLOTTE, a North Carolina Municipality,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

———————————

# BRIEF OF APPELLEES

———————————

**Steven A. Bader**
CRANFILL SUMNER, LLP
P.O. Box 27808
Raleigh, NC 27611
(919) 828-5100

*Counsel for Appellee*
  *City of Charlotte*

**Lori R. Keeton**
LAW OFFICES OF LORI KEETON
6000 Fairview Road, Suite 1200
Charlotte, NC 28210
(704) 575-9204

*Counsel for Appellee*
  *Bradley Leak*

**Patrick H. Flanagan**
**Stephanie H. Webster**
CRANFILL SUMNER, LLP
P.O. Box 30787
Charlotte, NC 28230
(704) 332-8300

*Counsel for Appellee*
  *City of Charlotte*

**Terry L. Wallace**
WALLACE LAW FIRM PLLC
6000 Fairview Road, Suite 1200
Charlotte, NC 28210
(704) 626-2903

*Counsel for Appellees*
  *Charlotte Mecklenburg Board*
  *of Education and Anthony Perkins*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1182          Caption: Jane Doe v. Charlotte-Mecklenburg Bd. of Educ. et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Charlotte-Mecklenburg Board of Education
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____      Date: _____03/05/2023_____

Counsel for: Charlotte-Mecklenburg Bd. of Educ.

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-1182</u>       Caption: <u>Doe v. Charlotte Mecklenburg Board of Education, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Defendant Bradley Leak</u>
(name of party/amicus)

_____

 who is _____<u>appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: ___/s/ Lori R. Keeton_____    Date: _____03/07/23_____

Counsel for: __Defendant Bradley Leak_____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1182__   Caption: __Jane Doe v. Charlotte-Mecklenburg Bd. of Educ. et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Anthony Perkins__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____       Date: _____03/05/2023_____

Counsel for: Anthony Perkins

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1182__      Caption: __Doe v. Charlotte Mecklenburg Board of Education, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Defendant City of Charlotte__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Bader          Date: _____ 3/6/2023 _____

Counsel for: Defendant City of Charlotte

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT OF THE CASE .................................................................. 1

    Allegations and Procedural History .................................................. 1

    Jane Doe and Q.W. were students at MPHS in November
    2015 ...................................................................................................... 2

    Jane Doe and Q.W. started to text one another in late October
    2015 ...................................................................................................... 3

    Jane Doe texted with Q.W. and her friends on November 3,
    2015 ...................................................................................................... 4

    Officer Leak called out to Jane Doe as he directed traffic .............. 5

    Officer Leak did not see Q.W. allegedly grab Jane Doe's wrist ...... 5

    Jane Doe texted her friends and her mother after she left
    campus .................................................................................................. 6

    Officer Leak and Assistant Principal Perkins went to find
    Jane Doe .............................................................................................. 8

    Jane Doe told Officer Leak that she had an uncomfortable
    encounter with Q.W. and Officer Leak asked his supervisor
    for guidance ....................................................................................... 10

    Assistant Principal Perkins spoke with Jane Doe's parents......... 12

    Officer Leak sought further guidance from two superior
    Officers ............................................................................................... 13

    CMPD and the Board started their investigation right away ...... 14

Jane Doe's mother accused Officer Leak of lying, which led to an internal affairs investigation ..................................................... 16

Jane Doe declined to speak with school officials ........................... 19

Jane Doe transferred from MPHS ................................................... 20

The Office of Civil Rights found the Board conducted a prompt, thorough, and impartial investigation ............................ 20

ARGUMENT SUMMARY ....................................................................... 21

ARGUMENT ............................................................................................ 24

I.   SUMMARY JUDGMENT SHOULD BE AFFIRMED FOR OFFICER LEAK AND ASSISTANT PRINCIPAL PERKINS .............................................................................. 24

     A.   Jane Doe's obstruction of justice claims do not withstand summary judgment .................................... 27

          1.   Obstruction of justice claims require more than speculation ................................................ 28

          2.   Jane Doe has not presented evidence that Officer Leak or Assistant Principal Perkins obstructed her legal remedies ............................ 29

          3.   Jane Doe has not unearthed a factual dispute on her obstruction claim based on speculation about her appearance and false reports ................................................................. 31

     B.   Officer Leak and Assistant Principal Perkins are entitled to public official immunity against Jane Doe's state law claims .................................................. 34

          1.   North Carolina law requires a high showing public official immunity is pierced ..................... 36

2. Jane Doe has not shown malice, corruption, or bad faith by Officer Leak and Assistant Principal Perkins ................................. 37

C. Officer Leak and Assistant Principal Perkins are entitled to qualified immunity against Jane Doe's equal protection claim ................................. 38

1. Jane Doe has not shown "deliberate indifference" and "discriminatory intent" needed to sustain her equal protection claims ................................. 40

2. Officer Leak and Assistant Principal Perkins are entitled to qualified immunity under *Hurley* ................................. 42

II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN RULING ON MOTIONS IN LIMINE ..... 44

A. The district court acted within its discretion when it declined to allow Jane Doe to introduce █████████████████████████████████ ████ ................................. 45

1. ████████████████████████████████ ████████████████████████████████ ....... 47

2. Jane Doe has not shown a prima facie negligent supervision case even with the excluded evidence ................................. 48

B. The district court acted within its discretion when it declined to give the jury an adverse inference spoliation instruction ................................. 49

1. Jane Doe's spoliation motion was untimely ....... 50

2. Jane Doe has not shown a spoliation sanction is warranted under Rule 37 ................................. 52

3.    At best, the district court's decision not to give an adverse inference instruction was harmless error........................................................ 54

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED THE MAGISTRATE'S RECOMMENDATIONS ........................... 55

CONCLUSION .......................................................................... 57

CERTIFICATE OF COMPLIANCE ....................................................... 58

CERTIFICATE OF FILING AND SERVICE........................................... 60

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................ 24, 25

*Andrews v. Crump*,
    547 S.E.2d 117 (N.C. App. 2001) ....................................... 35

*Atanassova v. General Motors, LLC*,
    2:20-CV-01728-RMG,
    2023 WL 2674383 (D. S.C. March 28, 2023) ................... 50

*Blackburn v Carbone*,
    703 S.E.2d 788 (N.C. App. 2010) ....................... 27, 28, 29

*Booker v. S.C. Dep't of Corr.*,
    855 F.3d 533 (4th Cir. 2017) ............................................. 42

*Braswell v. Medina*,
    805 S.E.2d 498 (N.C. App. 2017) ...................................... 34

*Campbell v. Anderson*,
    576 S.E.2d 726 (N.C. App. 2003) ...................................... 34

*Carter v. Lee*,
    283 F.3d 240 (4th Cir. 2002) ............................................. 25

*Cavallo v. Star Enter.*,
    100 F.3d 1150 (4th Cir. 1996) ...................................... 26, 46

*Cloaninger ex rel. Estate of Cloaninger v. McDevitt*,
    555 F.3d 324 (4th Cir. 2009) ............................................. 46

*CTB, Inc. v. Hog Slat, Inc.*,
    954 F.3d 647 (4th Cir. 2020) ...................................... 25, 26

*Doe v. City of Charlotte*,
    848 S.E.2d 1 (N.C. App. 2020) ................................................. 37, 38

*Doe v. Fairfax County School Board*,
    1 F.4th 257 (4th Cir. 2021) ...................................................... 26-27

*Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP*,
    213 F.3d 174 (4th Cir. 2000) .................................................... 25-26

*Evans v. Chalmers*,
    703 F.3d 636 (4th Cir. 2012) ......................................................... 34

*Evans v. Eaton Corp. Long Term Disability Plan*,
    514 F.3d 315 (4th Cir. 2008) ........................................................ 44

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ................................................ *passim*

*Goodman v. Praxair Servs., Inc.*,
    632 F. Supp. 2d 494 (D. Md. 2009) ................................................ 50

*Grayson v. Agadir Int. LLC*,
    856 F.3d 307 (4th Cir. 2017) .......................................... 25, 39, 46

*Green v. Kearney*,
    690 S.E.2d 755 (N.C. App. 2010) ....................................... 36, 37, 38

*Herra v. Finan*,
    709 Fed. Appx. 741 (4th Cir. 2017) ............................................... 25

*Houck v. Howell*,
    No. 5:14-CV-00187-RLV-DCK,
    2016 WL 1599806 (W.D.N.C April 21, 2016) ................................ 27

*In re Under Seal*,
    749 F.3d 276 (4th Cir. 2014) .................................................... 54-55

*Johnson v. Next Day Blinds Corp.*,
    No. WMN-09-2069, 2012 WL 2871418 (D. Md. 2012) ................... 50

*Lamb v. Littman,*
    38 S.E. 911 (N.C. 1901) .................................................. 48

*Leete v. Cty of Warren,*
    462 S.E.2d 476 (N.C. 1995) ........................................... 35

*Monell v. Department of Social Services of the City of New York,*
    436 U.S. 658 (1978) ................................................... 1, 2

*Pueschel v. Peters,*
    577 F.3d 558 (4th Cir. 2009) ........................................ 24

*Reichle v. Howards,*
    566 U.S. 658 (2012) ..................................................... 42

*Richardson v. Clarke,*
    52 F.4th 614 (4th Cir. 2022) ......................................... 54

*Schultz v. Capital Int'l Sec., Inc.,*
    466 F.3d 298 (4th Cir. 2006) ........................................ 45

*Scott v. United States,*
    328 F.3d 132 (4th Cir. 2003) .................................... 39, 55

*Smith v. Jackson City Bd. of Educ.,*
    608 S.E.2d 399 (N.C. App. 2005) ................................... 35

*Strickland v. Hedrick,*
    669 S.E.2d 61 (N.C. App. 2008) ..................................... 35

*Travelers Property Casualty, Co. v. Mountaineer Gas Co.,*
    2:15-CV-07959,
    2018 WL 1370862 (S.D. W.Va. March 16, 2018) ........... 50

*Turner v. United States,*
    736 F.3d 274 (4th Cir. 2013) ........................................ 44

*United States v. Brooks,*
    111 F.3d 365 (4th Cir. 1997) ........................................ 54

*United States v. Henry,*
    673 F.3d 285 (4th Cir. 2012) ......................................... 44

*United States v. Hornsby,*
    666 F.3d 296 (4th Cir. 2012) ......................................... 44

*United States v. Vidacak,*
    553 F.3d 344 (4th Cir. 2009) ......................................... 44

*Victor Stanley, Inc.,*
    269 F.R.D. 497 (D. Md. 2010) ......................................... 53

*Vodusek v. Bayliner Marine Corp.,*
    71 F.3d 148 (4th Cir. 1995) ......................................... 52

*Wilcox v. City of Asheville,*
    730 S.E.2d 226 (N.C. App. 2012) ................................... 35

**Statutes:**

20 U.S.C. § 1681 (Title IX) ............................................. *passim*

42 U.S.C. § 1983 ........................................................ *passim*

**Constitutional Provisions:**

U.S. Const. amend IV ...................................................... 40

**Rules:**

Fed. R. App. P. 28(a)(8) ......................................... 25, 39, 46

Fed. R. Civ. P. 37 ........................................................ 52

Fed. R. Civ. P. 37(e) ..................................................... 52

Fed. R. Civ. P. 37(e)(2)(B) ............................................... 52

Fed. R. Civ. P. 56(a) ..................................................... 24

Fed. R. Civ. P. 59 ........................................................ 45

Fed. R. Civ. P. 61 ................................................................... 45

Fed. R. Civ. P. 72(b) ............................................................. 57

Fed. R. Evid. 103(a) ............................................................. 45

Fed. R. Evid. 401 ................................................................. 47

**Other Authorities:**

CMPD policy available at: https://charlottenc.gov/
CMPD/Documents/Resources/CMPDDirectives.pdf ............................. 19

# STATEMENT OF THE CASE

<u>Allegations and Procedural History</u>

On November 3, 2015, Jane Doe (then a 17-year-old female) had oral sex with a Myers Park High School ("MPHS") classmate. The encounter took place during school hours and approximately one mile off-campus. Jane Doe maintains that the act was not consensual and that her classmate, Q.W., used force against her. Jane Doe sued the City of Charlotte ("Charlotte"), the Charlotte Mecklenburg Board of Education (the "Board"), Anthony Perkins (an assistant principal at MPHS) and Bradley Leak (a school safety resource officer at MPHS).

Jane Doe asserted seven claims for relief in her amended complaint:

(1)  Title IX claim (against the Board);

(2)  42 U.S.C. § 1983 equal protection claims (against the Board, Leak and Perkins);

(3)  42 U.S.C. § 1983 *Monell* claim (against the Board and Charlotte);

(4)  negligence (against Leak and Perkins);

(5)  negligent infliction of emotional distress (against Leak and Perkins);

(6)  negligent hiring, training, retention and supervision (against Charlotte);

(7)  common law obstruction of justice (against Leak and Perkins).

The district court dismissed the *Monell* claim against the Board and Charlotte. (J.A. 182-191) It later dismissed all claims against Leak and Perkins on summary judgment. (J.A. 773-807)

Jane Doe went to trial on her negligent retention claim against Charlotte and her Title IX claim against the Board. The district court granted a directed verdict to Charlotte. (J.A. 2379-2384) The jury found for the Board on the Title IX claim. (J.A. 2376-2378)

<u>Jane Doe and Q.W. were students at MPHS in November 2015</u>

On November 3, 2015, Jane Doe was a 17-year-old junior at Myers Park High School. (J.A. 468, J.A. 2254-2256) Q.W. was an 18-year old senior. (J.A. 2254-2256)

Officer Bradley Leak was a school safety resource officer at MPHS, and he had held this position since January 2013.[1] (J.A. 253-254) Before that, Officer Leak was a school safety resource officer at Alexander Graham Middle School from 2005-2013. (J.A. 232) Officer Leak had prior school safety resource officer experience at South Charlotte Middle

---

[1] Officer Leak was a full-time Charlotte-Mecklenburg Police Department (CMPD) officer assigned to Myers Park pursuant to a contract between the Charlotte-Mecklenburg Board of Education and the City of Charlotte. (J.A. 585-587)

School and with the Right Moves for Youth Program. (J.A. 224-225, J.A. 227)

MPHS has more than 3,000 students. (J.A. 601) The campus covers 60 acres and includes 15 buildings. (J.A. 603) The campus is surrounded by neighborhoods, roads, and nature trails. (J.A. 604) School safety resource officers do not supervise these adjacent areas, although they may venture into these spaces from time to time. (J.A. 605-606)

Jane Doe and Q.W. started to text one another in late October 2015

Jane Doe and Q.W. first exchanged text messages on Thursday, October 29, 2015. (J.A. 2226) They had a class together during third block. (J.A. 2227) Right away, Q.W. told Jane Doe that she looked attractive and Jane Doe responded with "thanks" and a wink emoticon. (J.A. 2228-2230) She told Q.W. that his comments were "sweet." (*Id.*)

The pair continued to exchange text messages through the weekend. (J.A. 2232-2278) On Sunday, November 1, 2015, Jane Doe asked Q.W. if he was a virgin. (J.A. 2278-2282) She also shared that she was curious about sex. (*Id.*) Q.W. suggested they should skip school for a sexual encounter. (J.A. 2283-2288)

<u>Jane Doe texted with Q.W. and her friends on November 3, 2015</u>

On Tuesday, November 3, 2015 at 6:22 a.m., Q.W. sent Jane Doe a text message and asked if she wanted to skip first block. (J.A. 2296) Jane Doe told Q.W. she was unsure and nervous. (J.A. 2297-2299)

At 6:42 a.m., Jane Doe texted Q.W. and reported that she was "questioning [his] motives," because it sounded like he was "just trying to hook up with me and not speak to me again and that's not good enough for me." (J.A. 2299) Q.W. maintained that they should skip class and Jane Doe disagreed. (J.A. 2299-2302) Even so, at 6:55 a.m. Jane Doe told Q.W. he could find her at the language arts building by the exit. (J.A. 2303-2304)

At the same time, Jane Doe was in a group text message with several friends.[2] (J.A. 1866-1906) At 6:32 a.m., Jane Doe told her friends that "he [Q.W.] still trying to get me to skip first block with him." (J.A. 1866) At about 7:02 a.m., Q.W. located Jane Doe in the language arts building after she shared her location with him and the pair walked out together. (J.A. 1880)

---

[2] In this group chat, Jane Doe and her friends used pseudonyms like "My Trap Queen" or "Queen," for example, rather than their real names.

## Officer Leak called out to Jane Doe as he directed traffic

While Jane Doe texted with Q.W. and her friends, Officer Leak directed traffic at MPHS. (J.A. 329-334) ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████ (J.A. 2812-2814) ███████

███████████████████████████████████████

██████████ (J.A. 2827) Officer Leak called out, "Jane Doe, I see you. As soon as I finish here. I'm going to call your mother." (J.A. 332) ███████

███████████████████████████████████ (J.A. 332, J.A. 2813-2814) Jane Doe heard what Officer Leak said when he called out to her but she did not respond to him. (J.A. 490-493)

## Officer Leak did not see Q.W. allegedly grab Jane Doe's wrist

Jane Doe testified in her deposition that Q.W. grabbed her wrist and pulled her off campus after the pair turned around. (J.A. 491-493) Even so, Jane Doe acknowledged that Officer Leak did not see this alleged contact. (J.A. 529-531) In particular, Jane Doe testified:

> Q. And when he grabbed your hand or grabbed your wrist, were you still in … Officer Leak's presence?
>
> A. I don't think so. I don't know if he saw the wrist grabbing.

Q. But you didn't say anything to Officer Leak at that point, right?

A. No.

Q. Okay. And where -- about -- … -- about how many feet were you from Officer Leak when QW grabbed your wrist?

A. He was, like, across the street….

…

Q. So Officer Leak wouldn't have known that he grabbed your wrist or anything like that?

A. No. He didn't see it.

(*Id.*)[3] Officer Leak testified that he did not see any physical contact between Jane Doe and Q.W. (J.A. 358-359)

<u>Jane Doe texted her friends and her mother after she left campus</u>

After she left MPHS with Q.W., Jane Doe sent separate text messages to her mother and her friends. At 7:02 and 7:03 a.m. Jane Doe texted "I'm being kidnapped" and "Help" with two eyeball emoticons to her friends. (J.A. 1874) Jane Doe's friends told her she "better not be skipping" with Q.W. (J.A. 1881-1887)

---

[3] A week after the incident with Q.W., Jane Doe told CMPD Detective Abigail Banner that Officer Leak "didn't see" Q.W. grab her wrist. (J.A. 2442) Jane Doe confirmed in her deposition that the transcript of this interview was accurate. (J.A. 521)

At 7:19 and 7:20 a.m., Jane Doe texted her friends "Call the cops" and "Somebody go to officer lee [sic]." (J.A. 1888) Jane Doe's friend J.D. responded first. (J.A. 1889) J.D. did not respond with concern, but instead wrote "[w]hat if she's in class and she's perfectly fine." (*Id.*) The friends then asked Jane Doe where she was and she reported off campus with no further information. (J.A. 1889-1892) At 7:30 a.m., J.D. asked Jane Doe, "[a]re you in danger?" and Jane Doe responded, "[n]o he's just talking." (J.A. 1897) At 7:31 a.m., Jane Doe texted the group and reported she saw "hassell street." (J.A. 1898)

Jane Doe had a separate text message thread with her mother, Mrs. Doe, at this time. At 7:18 a.m. Jane Doe texted "Mom I'm being kidnapped" and she reported that she was off campus with Q.W. (J.A. 1971-1973) Mrs. Doe's first response was to ask Jane Doe if she was being serious. (J.A. 1972) At 7:24 a.m. Mrs. Doe texted that she was on the way and asked Jane Doe where she was. (J.A. 1974) Jane Doe texted that she did not know, but at 7:31 a.m. reported that she saw a sign for Hassell Street. (J.A. 1974-1975)

<u>Officer Leak and Assistant Principal Perkins went to find Jane Doe</u>

Officer Leak finished traffic duties between 7:15 and 7:25 a.m. (J.A. 366) At that point, he went to his office to look for Mrs. Doe's phone number. (*Id.*) ████████████████████████

████████████████ (J.A. 371, J.A. 2813-2815) ████████

████████████████████████████████████

███████████████████████████ (J.A. 385, J.A. 2815)

████████████████████████████████████

████████████████████████████████████

████████████████ (J.A. 366-370, J.A. 2813-2815) ████

████████████████████████████████████

█████████████████████████████ (*Id.*) ████

████████████████████████████████████

████████████████ (*Id.*)

████████████████████████████████

████████████ (J.A. 2815) ████████████████

█████████████████████████ (J.A. 2816) ████

████████████████████████████████████

█████████████████████████ (J.A. 388-390, J.A.

2816) Assistant Principal Perkins took J.D.'s mobile phone with him. (J.A. 2630)

Officer Leak and Assistant Principal Perkins drove to Hassell Place but did not see the students. (J.A. 2630) They also went to the "bamboo forest," which is a greenway near Westfield Road and behind the Park Road Shopping Center. (*Id.*) This area is about one mile from MPHS. (*Id.*)

Officer Leak did not believe anyone was in the bamboo forest because it rained the day before and the area was very muddy. (J.A. 400-402) They also checked the nearby Chick-fil-A and the local Circle K convenience store. (J.A. 400-401, J.A. 2630)

At 7:37 and 7:41 a.m. Mrs. Doe texted Jane Doe and reported that she was on Hassell Street, but she could not find Jane Doe and "the police is coming just tell us where u r." (J.A. 1975-1976)

At 7:51 a.m., Jane Doe texted Mrs. Doe "I wa[s] attacked" and "Idk [I don't know] where we are." (J.A. 1976) Mrs. Doe responded "the police me [and Mr. Doe] are looking for u." (*Id.*) At 7:58 a.m. Jane Doe reported that she was in woods by MPHS. (J.A. 1978) At 8:00 a.m., she reported that Q.W. would walk her back to campus. (*Id.*)

Officer Leak and Assistant Principal Perkins located Jane Doe and Q.W. as they walked down Brandywine Road almost a mile from campus. (J.A. 2630) Jane Doe testified that she walked out of the woods and Officer Leak and Assistant Principal Perkins found her "right after the attack" as in "seconds after the attack happened." (J.A. 2517-2518)

█████████████████████████████████████████████████

█████████████████████████████████████ (J.A. 404-405, J.A. 2816-2817) Jane Doe looked the same to Officer Leak as when he saw her earlier that morning. (J.A. 403). Assistant Principal Perkins did not notice anything unusual about her appearance either. (J.A. 2631) Jane Doe testified that when she came from the woods "there was semen on my shirt and my hair was messed up and I had mud on my boots." (J.A. 2520)

### Jane Doe told Officer Leak that she had an uncomfortable encounter with Q.W. and Officer Leak asked his supervisor for guidance



(J.A. 2817)

(*Id.*)

(*Id.*)



(J.A. 2817)

(*Id.*)

(*Id.*)

(J.A. 2817-2818)

(*Id.*)

Officer Leak then called his supervisor, Sergeant Smith, to describe what Jane Doe reported. (J.A. 419-422) Officer Leak made this call because Jane Doe reported that she felt uncomfortable, and his approach in such cases was to pass information to his supervisors for direction on how to proceed. (J.A. 419-421)

As Jane Doe recalled it, Officer Leak tried to ask her what happened as they drove back to campus, but Jane Doe "didn't say anything." (J.A. 659) After they got to campus and Q.W. and Assistant Principal Perkins exited the vehicle, Jane Doe told Officer Leak that she had been "attacked." (J.A. 496) Jane Doe explained that Q.W. "made me

11

do things with him in the woods." (J.A. 496-497) Officer Leak asked Jane Doe what she meant and Jane Doe did not respond. (*Id.*) Jane Doe testified that Officer Leak was on the phone with someone else (Sergent Smith) during this exchange. (*Id.*) Either way, Jane Doe testified that she did not tell Officer Leak that Q.W. kidnapped her (J.A. 2506) and she did not tell Officer Leak that Q.W. used force against her. (J.A. 535-536)

<u>Assistant Principal Perkins spoke with Jane Doe's parents</u>

Assistant Principal Perkins walked back to Officer Leak's office with Q.W. (J.A. 2631) Mr. Doe was present at the office when they arrived. (*Id.*) Mr. Doe gave his phone to Assistant Principal Perkins so that Perkins could speak with Mrs. Doe. (*Id.*) Mrs. Doe told Assistant Principal Perkins, among other things, that "this was not the way to treat a rape victim." (*Id.*)

Jane Doe never discussed what happened with Assistant Principal Perkins. (J.A. 2531-2532) In fact, Jane Doe never discussed what happened with Mrs. Doe either, even to "this day." (J.A. 2574, J.A. 2576) Mrs. Doe assumed a rape had occurred because Jane Doe claimed she was "attacked" in her text message. (*Id.*)

Jane Doe's parents told Assistant Principal Perkins that they intended to take her to the hospital. (J.A. 2631) ████████████ ████████████████████████████████ (J.A. 417, J.A. 2818) Before they left school, Assistant Principal Perkins told Mrs. Doe over the phone that he had not spoken with Jane Doe yet and that he needed to get a statement from her. J.A. 2631.[4] Mr. Doe never said anything about Jane Doe's appearance to Assistant Principal Perkins. (J.A. 2631, J.A. 2623-2624)

<u>Officer Leak sought further guidance from two superior Officers</u>

Right after Jane Doe left campus, at 8:19 a.m., Officer Leak called Sergeant Muriel Hughes, a Charlotte-Mecklenburg Police Department supervisor for sexual assault crimes. (J.A. 2996-2998) Sergeant Hughes told Officer Leak that the incident as described by Jane Doe did not meet the elements of a sexual assault. (J.A. 2996-2998, J.A. 3006) She told Officer Leak to "do a long MI [Miscellaneous Incident Report]." (*Id.*)

After this call, at 8:26 a.m., Detective Abigail Banner called Officer Leak at Sergeant Hughes' request. (J.A. 3026) Officer Leak relayed what

---

[4] In her recorded interview with Detective Clark on November 3, 2015, Jane Doe admitted that Assistant Principal Perkins had told her that he needed to speak with her before she left school to go to the hospital. (J.A. 2215)

he learned from Jane Doe and Detective Banner told Officer Leak that "[b]eing uncomfortable is uncomfortable, but we got to have force…. And if there's no force, we don't have a crime." (J.A. 3031)

Officer Leak made the "Miscellaneous non-Criminal / Other Unlisted Non-Criminal Incident – truancy" report as directed by Sergeant Hughes. (DE 82-34, pp. 2-6). Officer Leak made the initial report at 1:39 p.m. (*Id.*) The initial report describes Jane Doe skipping class. (*Id.*) About 90 minutes later, at 3:01 p.m., Officer Leak entered a longer narrative where he described the day's events, including J.D.s report that Jane Doe was missing and could be in trouble, and his conversation with Jane Doe where she reported that she had Q.W.'s semen on her sweater. (*Id.*)

CMPD and the Board started their investigation right away

CMPD sexual assault detectives came to MPHS after Jane Doe left campus. (J.A. 2631) Detectives interviewed Q.W. with Assistant Principal Perkins present. (*Id.*) Q.W. told detectives that he and Jane Doe skipped class and went to a wooded area off-campus where Jane Doe performed oral sex on him. (J.A. 2631-2632) Q.W. described the encounter as consensual. (*Id.*) Assistant Principal Perkins and the

14

detectives reviewed the text messages between Jane Doe and Q.W. (*Id.*) Q.W. also provided a handwritten statement. (*Id.*) Detectives also interviewed J.D. and obtained a handwritten statement from her. (*Id.*) Q.W. was immediately sent home and suspended for 10 days. (J.A. 2632) He was also removed from the classes he shared with Jane Doe. (*Id.*)

The Board investigated the November 3, 2015 incident as one involving an alleged sexual assault. (J.A. 2633) Assistant Principal Perkins completed an incident reporting form for the school district. (J.A. 2632) The report describes the incident in general terms. (*Id.*) Jane Doe is identified as the "(victim)." (*Id.*) Later that day, a senior administrator for central community learning sent an email to other officials. (J.A. 2652) The administrator wrote that Jane Doe's parents "allege that the daughter was raped but the school administration has evidence that may suggest that it may have been consensual." (*Id.*) The last sentence states that law enforcement's investigation is ongoing. (*Id.*)

At 10:12 p.m. on November 3, 2015, Jane Doe gave an interview to CMPD detective W.B. Clark. (J.A. 2212-2219) Though Jane Doe had an interview scheduled for the following day with a CMPD detective, Mrs. Doe decided to bring her to a random CMPD precinct after hours and

demand she be interviewed.  In the course of the interview, Jane Doe told Detective Clark that she skipped class with Q.W., that Q.W. grabbed her wrist and they walked off-campus, that Q.W. told Jane Doe that he liked her and she could trust him, and that the pair walked to the bamboo woods where Jane Doe performed oral sex on Q.W. (*Id.*) Jane Doe told Q.W. she did not want to perform oral sex and that she asked him to stop but he did not listen. (J.A. 2214)[5]

<u>Jane Doe's mother accused Officer Leak of lying, which led to an internal affairs investigation</u>

The next day, November 4, 2015, Jane Doe and her mother had a telephone conference with CMPD Sergeant Burke. (J.A. 3141-3193) At this point, Jane Doe claimed that she did not speak to Officer Leak at all on November 3, 2015 and she claimed that Officer Leak made up his report. (J.A. 3143-3159) This prompted an internal affairs investigation.

████████████████████████████████████████

(J.A. 2810-2832) ████████████████████████████

(*Id.*) ██████████████████████████████████████

---

[5] Jane Doe was interviewed by veteran sexual assault Detective Banner on November 12, 2015. (J.A. 2436-2452) In that interview, Jane Doe described Q.W. using force against her. (*Id.*) Detective Banner had some reservations that Jane Doe's story had changed. (*Id.*)

████████████████████████████████████████

████████████████████████ (*Id.*)

Internal affairs also interviewed Assistant Principal Perkins on November 4, 2015. (J.A. 2633) Assistant Principal Perkins described how he and Officer Leak searched for and located Jane Doe and Q.W., and he reported that Jane Doe mouthed the word "help" when they found them. (J.A. 2655-2665) Assistant Principal Perkins also told CMPD detectives that when he had J.D.'s phone in Officer Leak's vehicle, he saw text messages from Jane Doe to her friends that stated, "I was just assaulted" and "if I got AIDS, I'm going to kill myself."[6] (J.A. 2662)

The next day, November 5, 2015, internal affairs interviewed Detective Banner. (J.A. 3024-3042) Detective Banner described her investigation, including her conversations with Officer Leak, Assistant Principal Perkins, and Jane Doe's parents and friends. (J.A. 3059-3060) Detective Banner did not believe a crime had been committed. (*Id.*) Rather, Detective Banner developed the impression that Jane Doe expressed fear in text messages in order to lay the groundwork so that

---

[6] During the course of his investigation, Assistant Principal Perkins did not review and did not have copies of the printed group text messages between Jane Doe and her friends. (J.A. 2635)

she would not get in trouble with her parents for skipping school (J.A. 3044, J.A. 3057-3058) According to Detective Banner, Jane Doe was "willingly coordinating her activities for Tuesday [November 3, 2015] morning." (J.A. 3058) She also found no indications that Q.W. had been deceptive in his description of events. (J.A. 3063)

Internal affairs interviewed Detective Hughes that same day. (J.A. 2994-3023) Detective Hughes also stated that based on what she learned in the investigation, she did not believe that a sexual assault occurred. (*Id.*)

Internal affairs interviewed sexual assault Detective Clark on November 9, 2015. (J.A. 2833-2869) Detective Clark, like the other officers, reported what he learned in his investigation, including his interview with Jane Doe. (*Id.*)

██████████████████████████████████████████████

███████████████ (J.A. 3066-3077) ███████████████

████████████████████████ (*Id.*) That means the "investigation proved the allegation to be false. The incident never occurred or the employee was not involved in the incident, or the investigation

conclusively proved that the employee's alleged act or actions that would constitute misconduct did not occur."[7]

<u>Jane Doe declined to speak with school officials</u>

Although Jane Doe and Mrs. Doe were aware that Assistant Principal Perkins wanted to speak with her as part of the Board's investigation, (J.A. 2215, J.A. 2631), on November 6, 2015, Mrs. Doe sent an email to MPHS administrators that stated, in part:

> We will not discuss any specifics about the events that took place on Tuesday [November 3, 2015] or do not want to be informed of any outcomes of the school investigation.

(J.A. 2680-2681) Three days later, on November 9, 2015, the school completed its investigation and concluded the incident between Jane Doe and Q.W. was consensual. (J.A. 2633-2634) At that time, the Board had not received any information to credibly substantiate Jane Doe's claim that she was kidnapped or sexually assaulted, whether from CMPD or from Jane Doe herself. (*Id.*) Q.W.'s suspension ended around this time, and the school implemented remedial measures for Jane Doe's benefit. (J.A. 2634-2635)

---

[7]*See* CMPD policy available at: https://charlottenc.gov/CMPD/Documents/Resources/CMPDDirectives.pdf Section 200-001

Assistant Principal Perkins did not inform Jane Doe or her parents of this outcome based on their request not to be notified. (J.A. 2634)

Jane Doe transferred from MPHS

On November 10, 2015, Jane Doe's mother emailed MPHS principal Mark Bosco to help facilitate a fast-tracked transfer to another CMS high school because the usual transfer process can take up to six weeks. (J.A. 2371) Principal Bosco stated that he would assist and would ensure that MPHS teachers and counselors provided Jane Doe with her school work until the transfer took place. (*Id*). Jane Doe transferred to South Mecklenburg High School effective November 17, 2015. (J.A. 2580-2582)

The Office of Civil Rights found the Board conducted a prompt,<br>thorough, and impartial investigation

On May 13, 2016, Jane Doe and her parents filed a complaint with the U.S. Department of Education Office of Civil Rights regarding the November 3, 2015 incident. (J.A. 2683-2696) Jane Doe received her student records in this process, and the records included documents related to the November 3, 2015 incident. (J.A. 2588-2590, J.A. 2898-2926) Jane Doe never asked the Board or Assistant Principal Perkins to amend or change any alleged inaccuracies in these records. (J.A. 2545, J.A. 2592-2593, J.A. 2635)

OCR investigated and issued its findings on December 5, 2017. (*Id.*) It concluded that the Board conducted a prompt, thorough, and impartial investigation of the November 3, 2015, incident. (J.A. 2692)

## ARGUMENT SUMMARY

Jane Doe theorizes that the various defendants covered up the alleged sexual assault in order to hurt her. Although Jane Doe has passion for her cause, the truth is that her lawsuit was built on speculation and her legal claims are untethered to precedent. On appeal, Jane Doe has not advanced and briefed any cogent argument for reversal. The "passing shots" she has presented do not support her claim for relief.

\*\*\*

Jane Doe's first contention is that summary judgment for Officer Leak and Assistant Principal Perkins should be reversed. Her assertions on this point are skinny, undeveloped, and without support in fact or law.

The record evidence shows that Officer Leak spoke with Jane Doe right after the alleged incident on November 3, 2015. Jane Doe told him what happened, and Officer Leak then sought advice from three different superior officers on how to handle the report. There is no evidence – none – that Officer Leak lied about what Jane Doe told him in order to hurt

her. For his part, Assistant Principal Perkins never spoke with Jane Doe after the alleged incident because her parents would not allow him to do so. Still, his reports to school administrators reflect that Jane Doe's parents believed that she was raped, and he investigated the incident as one involving an alleged sexual assault. Like with Officer Leak, there is no evidence that Assistant Principal Perkins lied about what he learned in the investigation in order to hurt Jane Doe.

Summary judgment should be affirmed. Jane Doe's obstruction of justice claims fail because Officer Leak and Assistant Principal Perkins did not impede her ability to seek a legal remedy, either through CMPD, the school system, or in her OCR investigation. Jane Doe's state law tort claims do not survive summary judgment because Officer Leak and Assistant Principal Perkins are entitled to public official immunity. Last, this Court should affirm summary judgment on Jane Doe's 42 U.S.C. § 1983 equal protection claim because Officer Leak and Assistant Principal Perkins have qualified immunity.

*** 

Jane Doe's second contention is that the district court abused its discretion with two evidentiary rulings. Jane Doe has not proven her claim

and these alleged errors do not support her call for a new trial. In particular, Jane Doe has not shown the district court abused its discretion when it: (1) ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ and (2) declined to give an adverse inference spoliation sanction for allegedly "lost" school surveillance video when her motion was untimely, the Board did not act with intent to deprive Jane Doe of the information when it allegedly lost the videos, the video at issue was not relevant to the Title IX claim, and the alleged error (if any) is harmless given the jury's verdict.

***

Last, Jane Doe contends that the district court abused its discretion when it did not follow the magistrate's recommendations for sanctions. This is a curious argument for two reasons. First, the district court actually adopted the magistrate's first recommendation that Jane Doe win her fees and costs associated with motions for sanctions against Charlotte and the Board. Second, although the district court declined the magistrate's recommendation to strike the motions for summary judgment by Charlotte and the Board as a discovery sanction, the court

denied the motions for summary judgment in the end. By extension, any claimed error here is moot.

***

Jane Doe had a full and fair chance to litigate a case that she clearly feels strongly about. But the record evidence did not permit her claims against Officer Leak and Assistant Principal Perkins to go to trial. The evidence did not allow the jury to decide her claim against Charlotte. And the jury ruled against her on her claim against the Board. Jane Doe has not identified an error that warrants reversal. The district court, therefore, should be affirmed on all points.

**ARGUMENT**

I. <u>SUMMARY JUDGMENT SHOULD BE AFFIRMED FOR OFFICER LEAK AND ASSISTANT PRINCIPAL PERKINS</u>

Summary judgment is reviewed *de novo*. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). By rule, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect

the outcome of the suit. *Id*. To defeat summary judgment, the nonmoving party must present evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

***

An appellant must set forth, with specificity, their arguments on appeal. *See e.g. Carter v. Lee*, 283 F.3d 240, 252 n.11 (4th Cir. 2002). By rule, the opening brief must contain an appellant's "contentions and *the reasons for them* with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8) (emphasis added). An argument that is not developed in a brief is waived, even if the brief "takes a passing shot at the issue." *Grayson v. Agadir Int. LLC*, 856 F.3d 307, 316 (4th Cir. 2017) *See also Herra v. Finan*, 709 Fed. Appx. 741, 747 (4th Cir. 2017).

Along these same lines, to warrant summary judgment reversal, an appellant must point to real factual disputes that go the jury. *See e.g. CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020). Summary judgment cannot be undone by "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP*,

213 F.3d 174, 180 (4th Cir. 2000). Neither should it be reversed on unsupported speculation. *CTB, Inc.*, 954 F.3d at 659.

These principles are important here because Jane Doe's arguments against summary judgment are undeveloped, vague, and conclusory. She claims that the district court decided "factual disputes and credibility issues" against her, but never identified these issues with any particularity. (Opening Brief pp. 17-26) Jane Doe also maintains that she "raised genuine disputes of several material facts." (*Id.* at 19-20) Yet she only briefed two so-called disputes: (1) Jane Doe's speculation that Officer Leak and Assistant Principal Perkins should have figured her a rape victim based on her alleged appearance; and (2) Jane Doe's unfounded belief that Officer Leak and Assistant Principal Perkins withheld information in their initial reports. (*Id.* pp. 20-21) Jane Doe has not pointed to any other alleged factual disputes and she cannot raise new arguments against summary judgment in her reply brief. *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n. 2 (4th Cir. 1996).[8]

In addition, Jane Doe's legal citations are all over the map. She cited a Title IX case (*Doe v. Fairfax County School Board*, 1 F.4th 257,

---

[8] Among other things, Jane Doe may try and claim Officer Leak and Assistant Principal Leak did not react quickly enough to try and find her.

263 (4th Cir. 2021)) in her arguments on obstruction of justice. She made no effort to analogize her facts to the public official immunity cases that she cites or explain how these cases apply to her claims for negligence and negligent intention of emotional distress. And she cited qualified immunity cases that govern constitutional claims she did not plead while, at the same time, she neglected to cite *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018), this Court's leading case on the constitutional claim she did plead.

As briefed below, there are no genuine issues of material fact as to the individual claims against Officer Leak and Assistant Principal Perkins. This Court should affirm summary judgment.

A.  <u>Jane Doe's obstruction of justice claims do not withstand summary judgment</u>

A claim for common law obstruction of justice requires proof that a defendant took an intentional act designed to obstruct, impede, or hinder the plaintiff's ability to seek and obtain a legal remedy. *Blackburn v Carbone*, 703 S.E.2d 788, 795 (N.C. App. 2010). Obstruction of justice claims are "very fact-specific and context-driven." *See Houck v. Howell*, No. 5:14-CV-00187-RLV-DCK, 2016 WL 1599806, at 8 (W.D.N.C April 21, 2016).

1. <u>Obstruction of justice claims require more than speculation</u>

Jane Doe offers a meandering five paragraph argument that her obstruction of justice claims should have survived summary judgment. Nowhere in that argument does she identify the actual obstruction that took place, much less any facts that show Officer Leak or Assistant Principal Perkins intended to keep Jane Doe from a legal remedy. These shortfalls are fatal to her obstruction of justice claim.

For example, the plaintiff in *Blackburn* sued a physician who refused to correct a medical record that frustrated the plaintiff's ability to pursue a tort recovery from an automobile accident. 703 S.E.2d at 795. Like Jane Doe, the plaintiff surmised that the doctor obstructed justice when he would not fix his medical record. *Id*. The North Carolina Court of Appeals rejected a speculative approach to obstruction claims. *Id*. at 796-97. It ruled that absent any evidence that the doctor "deliberately inserted an inaccuracy into his report and then intentionally failed to correct it" so that the plaintiff could not win his tort case, the obstruction of justice claim was subject to summary judgment. *Id*.

<u>Jane Doe has not presented evidence that Officer Leak or Assistant Principal Perkins obstructed her legal remedies</u>

Jane Doe has the same problem as the plaintiff in *Blackburn*. Three investigations occurred before Jane Doe filed suit: one by CMPD, one by the Board, and one by OCR. There is no evidence that Officer Leak or Assistant Principal Perkins obstructed these investigations in any way.

As to the CMPD investigation, on November 3, 2015, Officer Leak reported what Jane Doe told him to three superior officers and then followed their direction on how to proceed. (J.A. 2996-2998, J.A. 3006, J.A. 3026, J.A. 3031) Assistant Principal Perkins helped CMPD detectives interview Q.W. and J.D. on November 3, 2015. (J.A. 2630-2633) And during his internal affairs interview, Assistant Principal Perkins told CMPD two things that would seem to support (and not obstruct) Jane Dane's assault report, in particular, that Jane Doe mouthed "help" when he first saw her and that she wrote text messages to her friends where she reported "I was just assaulted" and "if I got AIDS, I'm going to kill myself." (J.A. 2655-2665, J.A. 2662) Perhaps most telling, Jane Doe herself spoke with Detective Clark on November 3, 2015 (J.A. 2212-2219) and later spoke with Detective Banner on November 12,

2015. (J.A. 2436-2452) Officer Leak and Assistant Principal Perkins did nothing to stop Jane Doe from telling her story to CMPD, nor did they otherwise interfere with CMPD's investigation.

As to the Board's investigation, the initial reports generated by Assistant Principal Perkins reflect that Jane Doe may be a "victim" and they memorialized her parents' belief that she had been raped. (J.A. 2648, J.A. 2652, J.A. 2675-2676)) Jane Doe then elected not to speak with school officials on her own. (J.A. 2680-2681) There is no evidence that Officer Leak or Assistant Principal Perkins impeded this investigation either.

And, as to the OCR complaint, Jane Doe had a full and fair opportunity to participate in that process without impediment from Officer Leak and Assistant Principal Perkins. (J.A. 2692) She received all her student records in that process and she never claimed the records were inaccurate. (J.A. 2545, J.A. 2588-2590, J.A. 2898-2926, J.A. 2592-2593, J.A. 2635, J.A. 2898-2926) In the end, OCR concluded that the Board conducted a prompt, thorough, and impartial investigation of the November 3, 2015, incident. (J.A. 2692)

3. Jane Doe has not unearthed a factual dispute on her obstruction claim based on speculation about her appearance and false reports

The only specific assertions Jane Doe makes for reversal (without meaningful argument) are that Officer Leak and Assistant Principal Perkins "withheld information about [Jane Doe's] appearance and sexual assault reports." (Opening Brief pp. 24, 26) The evidence, however, does not support either theory.

As to her appearance, Jane Doe testified that "there was semen on my shirt and my hair was messed up and I had mud on my boots." (J.A. 2520) Messed up hair is not objective evidence of a sexual assault. Neither is mud on shoes.[9] Semen on clothing could be evidence of a sexual assault, but Officer Leak documented this evidence in the report he completed on November 3, 2015 (DE 82-34, pp. 2-6) And Jane Doe did not speak to Assistant Principal Perkins on November 3, 2015 such that he would have reason to know that Jane Doe had semen on her shirt when they located

---

[9] *See* photographs of Jane Doe's boots taken by Mr. Doe at an unknown date. (J.A. 674, J.A. 677, J.A. 2164-2173) Mud is visible, but the boots are unremarkable given that Jane Doe stated that she had been in the woods and it had been raining earlier and the area was muddy. (J.A. 400-402)

her.[10] In any event, the semen on Jane Doe's shirt was consistent with the story that Q.W. later gave Assistant Principal Perkins and subsequently documented in his reports. (J.A. 2675, J.A. 2632)

There is no evidence that Officer Leak or Assistant Principal Perkins withheld information that Jane Doe reported that she was sexually assaulted.

Assistant Principal Perkins was not allowed to speak to Jane Doe on November 3, 2015 or at any point thereafter because her parents would not allow it. (J.A. 2531-2532, J.A. 2631-2633, J.A. 2680-2681) There is no credible allegation that he withheld Jane Doe's claim that she had been sexually assaulted by Q.W. What's more, Assistant Principal Perkins' incident report describes Jane Doe as a "victim" and, consistent with that characterization, he told central learning that Jane Doe's parents had alleged "that the daughter was raped." (J.A. 2652) And, as noted above, he told CMPD internal affairs that Jane Doe mouthed "help" when he first saw her and that she wrote text messages to her friends where she reported "I was just assaulted" and "if I got AIDS, I'm going to

---

[10] *See* photographs of Jane Doe's sweater. (J.A. 1956-1959) A substance is visible on the sweater, but no reasonable person would assume the substance is semen without additional information.

kill myself," two facts which would seem to bolster Jane Doe's version of what happened. (J.A. 2662-2665)

Jane Doe cannot point to any facts that suggest Officer Leak withheld information that Jane Doe had been assaulted. At best, Officer Leak and Jane Doe recall their conversation differently. But even Jane Doe admits that she did *not* tell Officer Leak that Q.W. kidnapped her and that she did *not* tell Officer Leak that Q.W. forced her to perform oral sex. (J.A. 535-536, J.A. 2506) Officer Leak never saw Jane Doe mouth "help," and he did not see her text messages. (J.A. 2662-2665) That information was not shared with him either. (*Id.*)

Most important, Officer Leak did not ignore what Jane Doe told him. Instead, he called a supervisor right away for guidance on what to do. (J.A. 419-422) Officer Leak then spoke with two other superiors, a sergeant and a detective, less than 15 minutes after his conversation with Jane Doe. (J.A. 2996-2998, J.A. 3006, J.A. 3026, J.A. 3031) After these conversations, Officer Leak followed his supervisor's directive and documented what he had been told in a report. (J.A. 2996-2998, J.A. 3006) There is no legal support for the idea that an officer who seeks

input from three supervisors on how best to handle a complaint has somehow obstructed justice.

As a final point, Officer Leak is also entitled to summary judgment because North Carolina law does not recognize an obstruction of justice claim against a police officer for his actions relating to a criminal investigation, which is what Jane Doe has alleged here (even though her claim has no record support). *Evans v. Chalmers*, 703 F.3d 636, 658 (4th Cir. 2012); *Braswell v. Medina*, 805 S.E.2d 498, 509-510 (N.C. App. 2017).

All in all, there is just no legal or factual support for Jane Doe's argument that Officer Leak or Assistant Principal Perkins obstructed her ability to pursue legal remedies on this evidence. Summary judgment should be affirmed on this point.

B.  Officer Leak and Assistant Principal Perkins are entitled to public official immunity against Jane Doe's state law claims

Public official immunity protects North Carolina officials from individual liability for negligence in performance of their governmental or discretionary duties. *Campbell v. Anderson*, 576 S.E.2d 726, 730 (N.C. App. 2003). Public official immunity can only be overcome if a plaintiff can show that the defendant's conduct was "(1) corrupt; (2) malicious; (3) outside of and beyond the scope of [his] duties; (4) in bad faith; or (5)

willful and deliberate." *Smith v. Jackson City Bd. of Educ.*, 608 S.E.2d 399, 411 (N.C. App. 2005).

Public official immunity is not available if an officer's conduct is wanton, contrary to the officer's duty, and done with intent to injure another. *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. App. 2012). This inquiry is subjective to the officer's state of mind. *Andrews v. Crump*, 547 S.E.2d 117, 123 (N.C. App. 2001). Malice, corruption and bad faith are never supposed. To the contrary, the law presumes "that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law." *Strickland v. Hedrick*, 669 S.E.2d 61, 68 (N.C. App. 2008). To overcome this presumption, a plaintiff must present "competent and substantial evidence" to the contrary. *Leete v. Cty of Warren*, 462 S.E.2d 476, 478 (N.C. 1995). Jane Doe has not provided any such evidence.

In her Amended Complaint, Jane Doe sued Officer Leak and Assistant Principal Perkins for negligence based on their alleged slow response to J.D.'s claim that Jane Doe had been kidnapped. (J.A. 72-76) Yet, Jane Doe makes no argument in her brief that Officer Leak and Assistant Principal Perkins acted with malice, corruption, or bad faith in

their response or search for her after her location was disclosed. (Opening Brief pp. 23-24) Instead, in a one-paragraph argument, she claims that public official immunity is unavailable because the officials acted in "bad faith" "[b]ased on the factual disputes recounted above," which seems to refer to actions taken by Officer Leak and Assistant Principal Perkins *after* they found Jane Doe. (*Id.*)

Either way, Jane Doe has not put forth evidence to overcome public official immunity.

1. <u>North Carolina law requires a high showing public official immunity is pierced</u>

*Green v. Kearney* shows the evidence needed to show malice, corruption, or bad faith. 690 S.E.2d 755 (N.C. App. 2010). The facts are bizarre. The plaintiff sued the county medical examiner after the medical examiner declared the plaintiff dead when, in fact, the plaintiff was alive. *Id*. The medical examiner arrived at an accident scene and was told the plaintiff had died. *Id*. at 758-59. Other first responders saw signs of life, but the medical examiner disregarded or disputed these observations. *Id*. The medical examiner directed the plaintiff be taken to the morgue, zipped in a body bag, and placed in a refrigeration drawer. *Id*. Two and a

half hours later, after an Officer asked to see the body for investigative purposes, the medical examiner realized the plaintiff was alive. *Id*.

The North Carolina Court of Appeals ruled that the medical examiner was entitled to public official immunity. *Id*. at 758. The medical examiner did not intend to cause the plaintiff harm, even if he was negligent when he disregarded signs of life. *Id*. Yet the facts did not show malice, corruption, or bad faith. *C.f. Doe v. City of Charlotte*, 848 S.E.2d 1, 12 (N.C. App. 2020) (public official immunity not available when officer made unfounded charges against the plaintiff based on his personal biases).

> 2. <u>Jane Doe has not shown malice, corruption, or bad faith by Officer Leak and Assistant Principal Perkins</u>

Again, in her Amended Complaint, Jane Doe claims that Officer Leak and Assistant Principal Perkins were negligent in their response to J.D.'s report that Jane Doe was off-campus and needed help. There is no evidence that suggests the response was malicious, corrupt, or in bad faith.

To the contrary, ██████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

█████████████████ (J.A. 388-390, J.A. 400-401, J.A. 2630-2631, J.A. 2816) Assistant Principal Perkins even took J.D.'s mobile phone with him when they went to find Jane Doe. (J.A. 2630) Nothing in this evidence shows malice, corruption, or bad faith under *Kearney* or *Doe*.

And, for the record, the evidence does not establish that Officer Leak or Assistant Principal Perkins acted with malice, corruption, or bad faith *after* they found Jane Doe, as briefed *supra* I.A. Simply put, there is no evidence that Officer Leak or Assistant Principal Perkins knew that Jane Doe had been assaulted and that they made a deliberate choice to hide that information in order to hurt Jane Doe.

Like with Jane Doe's obstruction of justice claim, there is no legal or factual support for Jane Doe's argument that public official immunity has been pierced. Summary judgment should be affirmed on this point as well.

C. <u>Officer Leak and Assistant Principal Perkins are entitled to qualified immunity against Jane Doe's equal protection claim</u>

Government officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018) (internal citations omitted) This Court retains discretion to decide

which inquiry to address first. *Id.* Under both inquiries, Officer Leak and Assistant Principal Perkins are entitled to qualified immunity. Even though the district court resolved the issue on the second inquiry, this Court can affirm on either or both grounds. *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003) (recognizing that this Court can affirm on any ground with record support, even if not a ground reached by the district judge).

Jane Doe has waived her arguments on qualified immunity because she has not presented a particular and developed argument against its application. Rather than brief specific reasons why qualified immunity is unavailable, Jane Doe settled for a "parting shot" at the issue that frustrates meaningful review by this Court. *C.f.* Fed. R. App. P. 28(a)(8); *Grayson*, 856 F.3d at 316.

To put a finer point on it, Jane Doe's sum argument on the point is that Officer Leak and Assistant Principal Perkins "are not entitled to qualified immunity because no reasonable official would have withheld information about Ms. Doe's appearance and sexual assault reports during active and criminal investigations." (Opening Brief p. 24) "Reasonableness," however, is the standard for negligence, not qualified

immunity. For legal support, Jane Doe string cites Fourth Amendment qualified immunity cases that have no application here. (Opening Brief pp. 24-26) Jane Doe makes no effort to explain how any of these cases show that qualified immunity is unavailable here.

In sum, Jane Doe has ignored the constitutional claim she did file and asked this Court to parse her citations for a legal theory that could have withstood summary judgment. Even if this Court is inclined to go down this road, the undisputed evidence shows that Jane Doe's 42 U.S.C. § 1983 claim against Officer Leak and Assistant Principal Perkins is subject to qualified immunity under both inquiries.

1. Jane Doe has not shown "deliberate indifference" and "discriminatory intent" needed to sustain her equal protection claims

A plaintiff in an equal protection claim for student-on-student sexual harassment must prove: (1) "discriminatory peer harassment"; (2) "deliberate indifference" by school officials, meaning the official "acquiesced in that conduct by refusing to reasonably respond to it"; and (3) discriminatory intent by school officials. *Hurley*, 911 F.3d at 702-03 (internal citations and quotation omitted).

True to form, Jane Doe does not point to specific facts that show deliberate indifference or discriminatory intent by Officer Leak or Assistant Principal Perkins. Nor does she attempt to align this case with any precedent where a court found deliberate indifference or discriminatory intent. Her one paragraph argument on this issue is almost all string cites and broad legal statements without any application to this case. Her only argument is that "[t]he District Court should have found Leak and Perkins did not act as reasonable state officials when they withheld information about Ms. Doe's appearance and sexual assault reports to obstruct the minor victim's ability to obtain legal justice." (Opening Brief p. 26) That argument seems to address her obstruction claim; not an equal protection violation.

For brevity, Officer Leak and Assistant Principal Perkins refer this Court to their arguments in *supra* I.A.3. The record evidence shows that Officer Leak took Jane Doe's report and asked three supervisors how best to handle it. Assistant Principal Perkins never talked to Jane Doe, because her parents refused to allow her to participate in the investigation. Still his reporting reflects Jane Doe's parents' belief that she may have been raped and that remedial measures were taken to

investigate and end the alleged harassment at MPHS. (J.A. 2631-2635) This evidence does not show deliberate indifference or discriminatory intent by Officer Leak and Assistant Principal Perkins. As a result, they are entitled to qualified immunity under the first inquiry.

More than that, as the district court held, Jane Doe did not have a "clearly established" right to sue Officer Leak and Assistant Principal Perkins for student-on-student sexual harassment in November 2015 under this Court's decision in *Hurley*. Both defendants are entitled to qualified immunity on the second inquiry too.

2. <u>Officer Leak and Assistant Principal Perkins are entitled to qualified immunity under *Hurley*</u>

A constitutional right must be "clearly established" before it is actionable *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). A right may be clearly established by a decision that involves the same conduct in question, or by a "robust consensus" of persuasive authorities. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (internal citations omitted).

In *Hurley*, this Court held for the first time that a plaintiff can sue a school administrator for an equal protection violation based on deliberate indifference to student-on-student sexual harassment. *Hurley*,

911 F.3d at 702. Even so, this Court ruled that the defendant university president was entitled to qualified immunity. *Id.* at 704-06. The alleged harassment in *Hurley* occurred in 2014 and 2015. *Id.* At that time, this Court's precedent had not clearly established a right to be free from a school administrator's deliberate indifference to student-on-student sexual harassment. *Id.* at 704-06.

That same rationale applies here. To be sure, *Hurley* clarifies a clearly established right in this area now. *Hurley*, 911 F.3d at 706. But this Court did not provide this guidance until 2018. *See generally id.* So in 2015, when Officer Leak and Assistant Principal Perkins responded to Jane Doe's report, they did not have fair warning that they could be liable for an equal protection violation based on their alleged deliberate indifference to student-on-student sexual harassment.

Jane Doe does not cite *Hurley* or make any argument that the district court erred when it followed *Hurley's* guidance and found Officer Leak and Assistant Principal Perkins were protected by qualified immunity here.

In the end, Jane Doe's 42 U.S.C. § 1983 claim against Officer Leak and Assistant Principal Perkins is subject to qualified immunity. This Court should affirm summary judgment on this point too.

## II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN RULING ON MOTIONS IN LIMINE

Motions in limine and spoliation rulings are reviewed for abuse of discretion. *Turner v. United States*, 736 F.3d 274, 281 (4th Cir. 2013); *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012). A district court abuses its discretion when it "acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012).

On review, this Court does not substitute its judgment for the judgment employed by the district court. *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009). Rather, "[a]t its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not merely reverse because it would have come to a different result in the first instance." *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). To top it off, even if a trial court abuses its discretion in evidentiary rulings, the error "is reversible only if it affects

a party's substantial rights." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 310 (4th Cir. 2006).[11]

Jane Doe argues the district court abused its discretion when it: (1) ████████████████████████████████████████████ and (2) declined to give the jury an adverse inference spoliation instruction against the Board. These rulings are within the district court's discretion and should not be upset by this Court. Further, Jane Doe has not shown that either ruling, even if wrong, warrants a new trial.[12]

A.   The district court acted within its discretion when it declined to allow Jane Doe to introduce ████████ ████████████████

Jane Doe went to trial against Charlotte on her claim for negligent retention and supervision related to Officer Leak. To prove the claim, Jane Doe had to show that Charlotte had actual or constructive notice

[11] *See also* Fed. R. Evid. 103(a) (preserving a claim for error only if it affects substantial rights of a party); Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

[12] Jane Doe never moved for a new trial under Fed. R. Civ. P. 59.

that Officer Leak was unfit for his position prior to November 3, 2015. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 337 (4th Cir. 2009).

At trial, Jane Doe argued that Charlotte had notice in four ways: (1) Officer Leak used "mentorship" to handle alleged criminal conduct; (2) Officer Leak's November 3, 2015 MI report; (3) a different MPHS sexual assault complaint handled by Officer Leak; and (4) the Board had authority to review school resources officers, but it did not do that, so Charlotte failed to collect information about Officer Leak's performance. (J.A. 2381-2382) The district court found these four instances did not show that Charlotte had actual or constructive knowledge that Officer Leak was unfit to be a school resource officer. (J.A. 2382-2384)

Jane Doe has not challenged this directed verdict on appeal. (*See generally* Opening Brief) Because she has not raised the argument, the issue is waived and Jane Doe cannot revive the point in her reply brief. Fed. R. App. P. 28(a)(8); *Grayson*, 856 F.3d at 316; *Cavallo*, 100 F.3d at 1152 n. 2.

Rather than meet the directed verdict question head on, Jane Doe argues that the district court abused its discretion █████████ ████████████████████████████████████████ ███████████████████████████████████████ (J.A. 3194-3197) ██████████████████████████████████ ███████ (*Id.*) ████████████████████████████ ██████████████████ (J.A. 3199) ████████████ ████████████████████████████████████████ ████████ (*Id.*)

1. █████████████████████████████████ ████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████ *See e.g.* Fed. R. Evid. 401. Jane Doe's allegations against Officer Leak in this appeal are extreme and particular. She contends, in no uncertain terms, that he flat out lied in his report. The evidence does not support this, as briefed above. ████████████████████████████████████

[REDACTED].[13]

More than that, any arguable relevancy is substantially outweighed by the danger that the evidence would prejudice Charlotte, confuse the issue, and mislead the jury. Jane Doe wants to make Officer Leak look bad. Her case is dependent on her personal belief that Officer Leak lied. [REDACTED] [REDACTED] [REDACTED] This discretionary ruling should be affirmed.

> 2. <u>Jane Doe has not shown a prima facie negligent supervision case even with the excluded evidence</u>

As pointed out above, the district court found Jane Doe's four points for negligent supervision insufficient to get her claim to the jury. (J.A. 2382-2384) She has not challenged this ruling on appeal. And at trial, Jane Doe made no offer of proof as to what the jury would have heard

---

[13] Jane Doe proves this point with her citation to *Lamb v. Littman*, a 1901 North Carolina Supreme Court case where the defendant mill operator employed a superintendent with a history of violence toward children that worked in the mill. 38 S.E. 911 (N.C. 1901). This history supported the plaintiff's negligent supervision theory when the superintendent injured the minor plaintiff at the mill. *Id.*

about ██████████████████████████████, nor did she argue that such evidence, along with the evidence the jury heard, would have been enough to get the negligent supervision claim to jury.[14] (*Id.*)

This matters because Jane Doe has conceded on appeal that she was "unable to bear her burden of proof at trial" on her claims against Charlotte absent the excluded evidence. (Opening Brief p. 29) But the excluded evidence has no relation to Officer Leak's fitness to be a school resource officer and Jane Doe has cited no case law that says otherwise.

All told, Jane Doe has not demonstrated the district court abused its discretion when it excluded Officer Leak's past personal matters. This Court should affirm on this point.

B.      The district court acted within its discretion when it declined to give the jury an adverse inference spoliation instruction

Jane Doe's request for an adverse inference spoliation sanction suffered from two fatal flaws at the trial court level, neither of which she addressed in her appeal. First, her motion was untimely. Second, there is no evidence the Board destroyed evidence with intent to deprive her of

---

[14] After the court made its ruling, Jane Doe did "note for the record, you know, our objection to that ruling based on motion in limine rulings related to spoliation and history." (J.A. 1599)

this information in her lawsuit. And, as a final point, Jane Doe has not shown how the adverse inference, if given, would have changed the verdict given her argument for a spoliation sanction in the first place. For all three reasons, this Court should affirm the district court ruling.

1. Jane Doe's spoliation motion was untimely

A motion for a spoliation sanction must be brought in a timely fashion. *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 508 (D. Md. 2009). The five *Goodman* factors dictate whether a motion is timely: (1) the time between the filing of the motion and the close of discovery; (2) the time between the filing of the motion and the filing of summary judgment motions; (3) the time between the filing of the motion and trial; (4) whether the court imposed a deadline for filing spoliation motions; and (5) the moving party's justification for not filing sooner. *Id.*[15]

---

[15] District courts in this circuit have declined motions for spoliation sanctions that are late under the *Goodman* factors. *See Atanassova v. General Motors, LLC*, 2:20-CV-01728-RMG, 2023 WL 2674383 (D. S.C. March 28, 2023); *Travelers Property Casualty, Co. v. Mountaineer Gas Co.*, 2:15-CV-07959, 2018 WL 1370862 (S.D. W.Va. March 16, 2018); *Johnson v. Next Day Blinds Corp.*, No. WMN-09-2069, 2012 WL 2871418 (D. Md. 2012).

The four[16] applicable factors favor the Board here. As to the first three, Jane Doe filed her motion on January 4, 2023, less than two weeks before trial, more than two years after discovery first closed, and, perhaps most important, more than three years after she learned that the videos had not been saved. (J.A. 3283, J.A. 3290-3291)

As to the last factor, Jane Doe offers no justification for not filing sooner in her brief. And the record shows that Jane Doe brought other late motions that drew the district court's ire. (J.A. 819-820) Indeed, five weeks before she filed the late spoliation motion, the district court denied an evidentiary motion because Jane Doe "delayed in bringing her motion" and "did not 'adequately explain this delay" or "demonstrate that she exercised diligence." (J.A. 819-820)

On this ground alone the district court acted within its discretion when it declined to give an adverse inference spoliation instruction.

---

[16] The fourth factor, a court-imposed deadline for spoliation motions, is not applicable because the district court did not set a specific deadline in this case.

2. <u>Jane Doe has not shown a spoliation sanction is warranted under Rule 37</u>

Jane Doe's spoliation motion is governed by Fed. R. Civ. P. 37(e). The rule governs whether a party is subject to a spoliation sanction if electronically stored information is lost. In part, it provides that:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (2)  only upon finding that the party acted with the *intent to deprive another party of the information's use in the litigation* may:
>
>> (B)  instruct the jury that it may or must presume the information was unfavorable to the party.

Fed. R. Civ. P. 37(e)(2)(B) (emphasis added).

The rule tracks with the common law principle that in order to receive an adverse inference instruction, the moving party must show the party that spoliated evidence engaged in "willful conduct" that resulted in the loss of evidence and that the lost evidence was relevant to a claim or defense. *See e.g. Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). *See also* Fed. R. Civ. P. 37 (Advisory Committee Notes) (rejecting the issuance of Rule 37 adverse inference jury instructions

based on a finding of negligence or gross negligence); *Victor Stanley, Inc.*, 269 F.R.D. 497, 526 (D. Md. 2010) ("an adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence was harmful to its case does not flow from mere negligence [in failing to preserve]").

The evidence here shows that Assistant Principal Perkins tried to save all MPHS surveillance videos from November 3, 2015, but he was only able to save one. (J.A. 3290-3291) Assistant Principal Perkins testified (in his individual capacity) at his December 2019 deposition that the video system erases videos after about two weeks and he is unsure what happened to the videos in this case. (J.A. 3291) Even if the Board had a duty to preserve the videos, there is no evidence that Assistant Principal Perkins, or anyone else affiliated with the Board, intended to deprive Jane Doe of the videos for use in this lawsuit. Jane Doe does not even argue that the evidence meets this standard. On this ground as well the district court acted within its discretion when it declined to give an adverse inference spoliation instruction.

3. <u>At best, the district court's decision not to give an adverse inference instruction was harmless error</u>

At the trial court level, Jane Doe argued for an adverse inference as to the videos because the footage would be "highly relevant to the jury's consideration of Ms. Doe's credibility with respect to her reports of being kidnapped." (DE 258-1, p. 6) The jury found for Jane Doe on this point though when it determined that she was subject to student-on-student sexual harassment. (J.A. 2376-2378) As such, any error on this point is harmless. *See United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).

On appeal, Jane Doe argues the adverse inference was needed to prove deliberate indifference by the Board. (Opening Brief pp. 31-34) Jane Doe did not make any argument to the district court explaining that the video was relevant to any aspect of the Title IX analysis (*see* DE 258-1)[17] and cannot raise it for the first time on appeal. *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022); *In re Under Seal*, 749 F.3d 276, 285

---

[17] Jane Doe's specific jury instruction request undercuts the arguments she now advances and further shows that her original request did not pertain to the Title IX deliberate indifference element. Jane Doe sought an instruction that the video would establish: "(1) her description of the events of that morning was accurate and (2) SRO Leak was in a position where he would have seen Q.W. grab Ms. Doe and force her into the woods." (DE 258-2, p. 1)

(4th Cir. 2014). Plus, the video is irrelevant to whether the Board acted with deliberate indifference in its post-incident investigation and implementation of remedial measures to end the alleged harassment, which was the only issue before the jury at trial.[18]

Jane Doe has not shown that the district court abused its discretion when it declined to impose an adverse inference spoliation sanction against the Board. This Court may affirm on any ground appearing in the record including those theories relied on or rejected by the district court judge. *Scott*, 328 F.3d at 137. This Court should affirm on this point.

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED THE MAGISTRATE'S RECOMMENDATIONS

Jane Doe's final argument is a head-scratcher. She contends that the district court erred when it did not follow the magistrate's

---

[18] Jane Doe did not put on any evidence of spoliation at trial or attempt to admit any evidence of what the video would have shown. Jane Doe did not depose any of the CMPD detectives, who saw the alleged video at issue, and she did not call them to trial. The undisputed trial testimony established that (1) although AP Perkins' "flagging" of the videos did not save them, (J.A. 1739-1740), CMPD had access to the school surveillance videos and preserved them (J.A. 1757), and the preserved videos were produced in discovery (five videos) (J.A. 2389, J.A. 2390); and (2) **there were no cameras in the area of the school where the alleged kidnapping occurred** (J.A. 1741-1742)

memorandum and recommendations on the motions for sanctions. (Opening Brief pp. 35-41) The magistrate made two recommendations: (1) that Jane Doe recover attorneys' fees and costs associated with the motions for sanctions; and (2) that the court strike the motions for summary judgment filed by Charlotte and the Board. (J.A. 771)

There is nothing for Jane Doe to win on this argument. First, the district court fully adopted the magistrate's recommendation on fees and costs and awarded Jane Doe fees and costs associated with her motions for sanctions. (J.A. 806-807).[19] Second, the district court denied the motions for summary judgment on the merits and Jane Doe proceeded to trial against those defendants. (J.A. 806-807) Had the district court struck the summary judgment motions altogether, the outcome would still be the same. In turn, there is no remedy for Jane Doe on appeal since her claims were tried to jury and both were unsuccessful. Third, the magistrate's recommendation to strike Charlotte's and the Board's summary judgment motions as a sanction was a pretrial matter

---

[19] The portion of the order entered by the district court judge concerning the award of costs and attorneys' fees associated with the motions for sanctions is substantively and nearly virtually identical to the magistrate's memorandum and recommendation. (*Compare* J.A. 770-771 *with* J.A. 806-807)

dispositive of a party's defense. Therefore, contrary to Jane Doe's claim, *de novo* review was appropriate. *See* Fed. R. Civ. P. 72(b).

## CONCLUSION

Jane Doe feels strongly about what happened here. But there is no evidence that Officer Leak or Assistant Principal Perkins lied about what they learned in their investigation. And Jane Doe had her day in court against Charlotte and the Board. The admissible evidence, however, led to defense verdicts. Jane Doe has not identified any reversible error and the district court orders and rulings should be affirmed.

This the 20th day of November 2023.

/s/ Steven A. Bader
Steven A. Bader
Stephanie H. Webster
Patrick H. Flanagan
CRANFILL SUMNER LLP
*Counsel for Appellee City of Charlotte*

Lori R. Keeton
LAW OFFICES OF LORI KEETON
*Counsel for Appellee Bradley Leak*

Terry L. Wallace
WALLACE LAW FIRM PLLC
*Counsel for Appellees*
  *Charlotte-Mecklenburg Board*
  *of Education and Anthony Perkins*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>11,728</u> words.

2.    This document complies with the typeface requirements because:

this document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook.</u>

Dated:  November 20, 2023

CRANFILL SUMNER LLP

BY:  <u>/s/ Steven A. Bader</u>
        STEVEN A. BADER
        N.C. State Bar No. 55931
        P.O. Box 27808
        Raleigh, North Carolina 27611
        Telephone: 919-828-5100
        E-mail:  sbader@cshlaw.com

PATRICK H. FLANAGAN
N.C. State Bar No. 17407
E-mail: phf@cshlaw.com
STEPHANIE H. WEBSTER
N.C. State Bar No. 12164
E-mail: swebster@cshlaw.com
Post Office Box 30787
Charlotte, North Carolina 28230
Telephone: (704) 332-8300

*Counsel for Appellee City of Charlotte*

LORI R. KEETON
Law Offices of Lori Keeton
N.C. State Bar No. 25813
6000 Fairview Road, Suite 1200
Charlotte, North Carolina 28210
Phone: 704-575-9204
Email: lkeeton@lorikeetonlaw.com

*Counsel for Appellee Bradley Leak*

TERRY L. WALLACE
Wallace Law Firm PLLC
N.C. State Bar No. 26806
6000 Fairview Road, Suite 1200
Charlotte, NC 28210
Phone: (704) 626-2903
E-mail: terry@wallacelawnc.com

*Counsel for Appellees*
  *Charlotte-Mecklenburg Board of*
  *Education and Anthony Perkins*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

This the 20th day of November 2023.

/s/ Steven A. Bader
Steven A. Bader
Stephanie H. Webster
Patrick H. Flanagan
CRANFILL SUMNER LLP
*Counsel for Appellee City of Charlotte*

Lori R. Keeton
LAW OFFICES OF LORI KEETON
*Counsel for Appellee Bradley Leak*

Terry L. Wallace
WALLACE LAW FIRM PLLC
*Counsel for Appellees*
  *Charlotte-Mecklenburg Board*
  *of Education and Anthony Perkins*